UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLIE LIM,<br><br>   Plaintiff,<br><br>  v.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>   Defendant. | Case No. 22-cv-07493-RS<br><br>**ORDER GRANTING IN PART, DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This is a dispute about insurance coverage. Plaintiff Dr. Kellie Lim avers that Defendant Lincoln National Life Insurance Company breached the terms of her disability insurance policy when it initially denied a claim for long-term benefits that she filed due to complications from her status as a triple-amputee. Once Plaintiff filed this litigation—which also includes the claim that Defendant violated the implied covenant of good faith and fair dealing—Defendant reversed course and granted the sought-after benefits.

The parties now bring cross-motions for summary judgment. In its motion, Defendant argues that Plaintiff's breach of contract claim fails as a matter of law because she cannot show damages caused by the alleged breach. Defendant separately argues that, under the breach of the covenant of good faith and fair dealing rubric, Plaintiff's bad faith claim fails because she cannot show economic damages caused by the alleged bad faith and because its initial denial resulted from a genuine dispute about its liability under the policy. Plaintiff, on the other hand, argues that she *can* show damages and that no reasonable trier of fact could find Defendant acted in good faith when it denied the claim. For the reasons discussed below, Plaintiff's motion is denied, and

1   Defendant's motion is granted in part and denied in part.

## II. BACKGROUND

Plaintiff overcame tremendous challenges to become a board-certified physician. At eight years old, she was diagnosed with meningococcal disease, a life-threatening infection that left her in a coma. Complications from the infection led to amputation of her legs below the knees, her right arm below the elbow, and all but the thumb and fourth finger of her left hand. Despite these conditions, she learned to use prosthetics, completed high school and college, and eventually attended medical school, where she graduated near the top of her class. After completing residency at UCLA Medical Center, Plaintiff practiced as an attending physician for one year in private practice before returning to UCLA Medical Center and practicing for eight more years.

Plaintiff's employer offered a disability insurance policy, issued by Defendant, which provided both short-term disability and long-term disability income protection. As a beneficiary, Plaintiff could qualify for long-term disability coverage if she demonstrated that "as a result of Injury or Sickness," she was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue h[er] Own Occupation in the usual and customary way," nor able to engage "in any occupation in which [s]he could reasonably be expected to perform satisfactorily[.]" Conover Decl., Ex. 1, Dkt. No. 46-1 (the "Policy") at LIN1985.

Throughout Plaintiff's time as a physician, her conditions caused debilitating pain that she managed through the use of prescription opiates. In 2020, new regulatory restrictions led doctors to reduce Plaintiff's dosage, causing her pain to increase. Then, on February 24, 2022, Plaintiff's right prosthetic leg broke. Belanger Decl., Ex. 2, Dkt. No. 52 (the "Claim File") at LIN591. To adjust to an old set of prosthesis, she took time off work and filed a short-term disability claim, which Defendant approved on May 5, 2022. *Id.* at LIN505. In a letter, Defendant explained that the benefits were only approved through March 30, 2022, and that determining her eligibility for ongoing benefits would require updated medical records. *Id.*

Plaintiff returned to work on a part time basis from April until the end of June, when she filed a claim for long-term disability benefits. Claim File at LIN605-606; *Id.* at LIN2044-45. On

July 12, Taylor Daigler, a Lincoln claims adjuster, conducted an initial interview with Plaintiff. Daigler's notes from the call reflect that Plaintiff reported a decline in her workflow over the past two or three years as well as chronic pain in her back and remaining fingers. The chief complaints, according to Daigler's testimony during a later deposition, were the back pain, trigger finger pain, and the pain associated with learning to reuse her prosthesis. Conover Decl., Ex. 3, Dkt. No. 46-1 ("Daigler Dep..") at 22. Daigler recorded that Plaintiff's pain was "not well controlled." Claim File at LIN2044. Although Plaintiff had a scribe to assist with using computers to enter medical reports and records, Plaintiff told Daigler that she had to retype much of the entries and also manipulate the mouse—activities that caused pain requiring repeated steroid injections in her thumbs. She had also undergone repeated radiofrequency ablation in her lower back and was had exhausted oral pain treatment medications. Less than two weeks after the interview, Plaintiff completed a form that requested her to explain what prevented her from engaging in "any gainful employment." In addition to describing her amputations, she explained that, "In the past 3-4 years, I have been experiencing worsening hip and back pain that has not been adequately controlled. My pain management physicians greatly reduced my medications due to CDC guidelines. I also developed thumb pain in December 2020 that has greatly reduced my capacity to work." *Id.* at LIN1928.

A few days later, Defendant referred Plaintiff's claim to MLS Group of Companies, LLC, a national peer review provider, for further evaluation. Dr. Michelle Alpert, a reviewer for MLS, examined Plaintiff's medical records and interviewed Dr. Goonjan Shah, Plaintiff's pain management specialist. According to Dr. Alpert's summary of their conversation, "Dr. Shah stated that [Plaintiff] has chronic pain which is controlled with her current medications. She does have amputations but is functionally able to sustain physical activity." Claim File at LIN1775. Based on her conversation with Dr. Shah and her review of Plaintiff's medical history, Dr. Alpert determined that Plaintiff "continues to have the capacity for sustained physical activity" and that "despite her chronic pain, she has capacity for sustained physical activity. She would only need restrictions/limitations related to her amputations." *Id.* at LIN1777. Notably, this report did not

discuss or address the finger pain that Plaintiff had complained about in her form and in her initial call with Daigler; instead, the "primary impairing Diagnos[es]" that Dr. Alpert identified were Plaintiff's amputations. *Id.* at LIN1776.

Daigler thereafter requested an addendum to the initial report that could address Plaintiff's finger pain and any restrictions for using a computer; Dr. Alpert obliged, providing a supplemental opinion on August 24, 2022 that Plaintiff "can perform frequent fingering, handling, gripping, feeling, grasping, and keyboarding/mousing for up to 15 minutes at a time followed by a 3-minute break throughout an 8 hour day." Claim File at LIN1768. No additional documents or interviews informed that opinion.

On September 1, 2022, after comparing Dr. Alpert's recommended restrictions with the vocational analysis of national requirements for physicians, Daigler recommended denying the claim based on a finding that Plaintiff is not totally disabled. *Id.* at LIN2040. Forty-one minutes later, her claims manager Jessica Belanger approved that recommendation, effectuating the denial via a written letter. *Id.*, *see also id.* at LIN154-158. When Daigler called Plaintiff to discuss the denial, Plaintiff expressed frustration and asked about the appeal process; she learned she would have 60 days to file an appeal, at which point board-certified physicians would review the claim. In a subsequent email, she complained that the peer reviewer "did not comment on my hand issues and only concentrated on my lower extremity amputations" and "did not contact my primary care physician for her opinion regarding my disability." *Id.* at LIN132.

On November 28, 2022, Plaintiff sued Defendant. Two weeks later, Belanger reviewed Plaintiff's file, reopened her claim, and approved her request for long term disability benefits. Belanger explained that this decision was reached after she "reviewed information received from atty following claim decision." Claim File at LIN2038. Thereafter, Defendant paid the sought-after benefits, including those which would have been paid sooner, but for the initial denial.

In this litigation, Dr. Shah has refuted Dr. Alpert's report as "inaccurate." Conover Decl., Dkt. No. 46-1, Ex. 7 (hereafter "Shah Declaration") at ¶ 2. According to Dr. Shah's sworn declaration, he "did not tell Dr. Alpert that Dr. Lim's chronic pain was 'well-controlled' by her

current treatment. In fact, Dr. Lim's chronic pain was not well-controlled as she consistently reported pain scores of 5 and above. I would only consider a patient's pain well-controlled if the patient were to consistently report pain scores of 2 and below." *Id.* ¶ 3. He further swore that he "did not tell Dr. Alpert that Dr. Lim was 'functionally able to sustain activity.' This is not terminology I employ when discussing a patient's physical capabilities. This expression lacks clarity, and its intended meaning concerning Dr. Lim's physical capabilities remains uncertain." *Id.* ¶ 4. Moreover, Dr. Shah also made clear that he never said Dr. Lim "would only need restrictions and limitations to her amputations" and stated that the subject of restrictions and limitations never arose during his call with Dr. Alpert. *Id.* ¶ 5. In fact, he still "believe[s] that Dr. Lim is unable to maintain full-time employment consistently," as he did when he spoke with Dr. Alpert. *Id.* ¶ 6.

### III. LEGAL STANDARD

A. <u>Summary Judgment</u>

Summary judgment is appropriate when the pleadings, discovery, and affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of proof to "make a showing sufficient to establish . . . the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the movant succeeds in demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3; *see also* Fed. R. Civ. P. 56(c)(1)(B).

Evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted). Rather, the nonmoving party has the burden of

identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

B. Breach of Contract

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citing *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968)). California law provides that damages in a breach of contract case are "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Calif. Civil Code § 3300.

C. Breach of Covenant of Good Faith and Fair Dealing

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. This principle is applicable to policies of insurance." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir. 2002) (quoting *Comunale v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 657 (1958)). "The responsibility of the insurer to act in good faith 'is not the requirement mandated by the terms of the policy itself' but is imposed by law, breach of which sounds in tort notwithstanding that the denial of benefits may also constitute breach of the contract." *Id.* (citing *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575 (1973)). "To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007), *as modified* (Dec. 19, 2007).

Under California law, to prove a breach of good faith and fair dealing claim involving insurance, a plaintiff must satisfy five elements: "(1) the insured suffers loss covered under an insurance policy; (2) the insurer was notified of the loss; (3) the insurer unreasonably fails or delays payment of the policy benefit; (4) the insured is harmed; and (5) the insurer's failure or

delay is a substantial factor in causing the insured's harm." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 851 F.3d 976, 988 n.4 (9th Cir. 2017). "The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir.2001). "[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Amadeo*, 290 F.3d at 1162.

### D. Punitive Damages

"[T]he conduct required to award punitive damages for the tortious breach of contract is of a different dimension than that required to find bad faith." *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 890, *as modified on denial of reh'g* (Mar. 29, 2000) (citing *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1286 (1994)) (alterations omitted). "[T]he evidence in support of the award of punitive damages must satisfy a distinct and far more stringent standard." *Id.* By statute, that standard requires the plaintiff to prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Calif. Civil Code § 3294(a). Malice means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Calif. Civil Code § 3294(c)(1). Oppression means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Calif. Civil Code § 3294(c)(2). Despicable conduct has been described as "[having] the character of outrage frequently associated with crime." *Taylor v. Superior Court*, 24 Cal. 3d 890, 894 (1979).

## IV. DISCUSSION

### A. Breach of Contract Claim

Defendant declares that Plaintiff's breach of contract claim must fail because her long-term disability claim was ultimately approved; Defendant has paid and continues to pay her benefits in full. Because she received the benefits due under the contract, Defendant argues that Plaintiff cannot demonstrate any damages resulting from the alleged breach.

Plaintiff does not dispute that Defendant has paid and continues to pay her claim. Instead, she raises the specter of additional damages stemming from the Defendant's initial failure to pay—namely the attorney's fees incurred as a result of this litigation. For support, she relies on *Brandt v. Superior Court*, where the California Supreme Court held that, "when an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort." 37 Cal. 3d 813, 817 (1985).

Plaintiff conflates her claims. *Brandt* construed attorney's fees to constitute damages in the context of a breach of good faith and fair dealing claim—*i.e.*, a tort claim—*not* a breach of contract claim. *See id.* ("What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action."). While the money Plaintiff has spent on legal counsel may be relevant to her own bad faith claim, it does not demonstrate the essential damages component of her contract claim.

Plaintiff also contends that she can show contract damages because of the withheld benefits on which she could have collected interest during the three-month duration of Defendant's initial refusal to pay. True, "when the insurer has received all information needed to determine liability for a claim, and the insurer determines that liability exists and fails to make payment of benefits to the insured within 30 calendar days after the insurer has received that information, any delayed payment shall bear interest, beginning the 31st calendar day, at the rate of 10 percent per year." Cal. Ins. Code § 10111.2(c). This provision is inapplicable to Plaintiff's case, however, as the insurer did not "determine[] that liability exists" until after she filed suit. Upon reversing its earlier denial of benefits, Defendant began paying out her claim within the required 30 calendar days. This satisfied the requirements of Section 10111.2(c) such that no interest was necessary. Plaintiff therefore cannot satisfy the damages element by reference to that section of the insurance laws.

Plaintiff's final attempt to prove contract damages is her citation to Section 3287 of the

California Civil Code, which provides that "any person who is entitled to recover damages certain, or capable of being made certain by calculation[,]" and whose entitlement vested upon a particular day, "is entitled also to recover interest thereon from that day[.]" Cal. Civ. Code § 3287(a). This argument is "misplaced." *See Onder v. Allstate Ins. Co.*, No. 02-cv-213-IEG, 2002 WL 1354826 (S.D. Cal. 2002). As that district court observed, "Plaintiffs cannot use section 3287, which pertains to damages, to show that there is a genuine issue of material fact with respect to the breach of contract claim itself." *Id.* "Rather, plaintiffs must first show that they are entitled to damages by establishing that defendants breached a provision of the insurance contract[.]" *Id.*; *see also Sampson v. Century Indem. Co.*, 8 Cal. 2d 476, 479 (1937) (highlighting that a company is not liable for interest absent a provision for payment of interest in an insurance policy).

In sum, given that Defendant paid her claim and continues to do so, and that the contract did not provide for interest payments on any delays, Plaintiff fails to show how she suffered damages due to the alleged contractual breach—an essential element of her claim. Defendant's motion for summary judgment is therefore granted with respect to the alleged breach of contract.

B. <u>Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith)</u>

*1. Damages*

Defendant seeks summary judgment on Plaintiff's bad faith claim because it argues Plaintiff cannot show economic damages resulting from the allegedly unfair dealing she experienced. Plaintiff opposes the motion, pointing to the attorney's fees and emotional distress she incurred after filing suit to challenge the claim denial as the proximate result of Defendant's actions.

As just discussed, "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort." *Brandt*, 37 Cal. 3d at 817. "The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract." *Id.* at 819. It follows that the fees Plaintiff incurred in the months leading

up to the eventual approval of her claim amount to economic damages. Moreover, the existence of those damages unlocks her ability to claim emotional distress damages she described in her complaint. *See Waters v. United Servs. Auto. Assn.*, 41 Cal. App. 4th 1063, 1072 (1996). ("[E]motional distress damages are recoverable in a bad faith action arising out of a third party claim only when the insured establishes a loss of property.") Because Plaintiff has made a satisfactory showing, Defendant's damages-based argument for summary judgment as to the bad faith claim is denied.

*2. Reasonableness*

Both parties seek summary judgment on Plaintiff's bad faith claim, arguing that Defendant's decision to deny her long-term disability benefits claim was either so reasonable or so unreasonable that it may be decided as a matter of law; in other words, that her contractual right to the claimed disability benefits was either undisputedly disputable or undisputedly undisputable.

As to the former, Defendant argues that the genuine issue rule warrants summary adjudication in its favor. "The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law." *Wilson*, 42 Cal. 4th at 724 (internal quotation marks omitted). In other words, if the insurer denied a claim due to "a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim," said insurer "is not liable in bad faith." *Id.* at 723.

In Plaintiff's view, however, no rational factfinder could construe the facts and conclude a genuine dispute existed with respect to the validity of her claim. Rather, she contends that the only reasonable inferences to be drawn from the record support concluding that the insurer denied the claim without "fully inquir[ing] into possible bases that might support [it]" or "thoroughly investigating the foundation for its denial." *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979).

Neither movant demonstrates that this matter warrants summary judgment, as neither has

shown the absence of a genuine dispute over a material fact.  As to the Defendant's motion, the factual dispute over what Dr. Shah told Dr. Alpert, standing by itself, precludes summary judgment.  In the light most favorable to the nonmovant, Dr. Shah's sworn declaration demonstrates that Dr. Alpert mischaracterized the substance of her only interview with a care provider about Plaintiff.  Such a mischaracterization could amount to bad faith, especially in this context, where Dr. Alpert did not conduct any other interviews.  Moreover, the fact that Dr. Alpert completely neglected to discuss Plaintiff's finger pains in her first recommendation undermines the notion that her denial was the result of careful inquiry.  At bottom, Dr. Alpert's recommendation frames Plaintiff's claim as one about her long-recognized amputee status, when, in fact, Plaintiff complained of chronic pain that stemmed from new complications of that status, including pain caused by new prosthetics and newly developing in her remaining fingers.  That Defendant quickly overturned Dr. Alpert's recommendation upon hearing from counsel hardly demonstrates that the denial was subject to a reasonable dispute—if anything, it suggests that denial was plainly unreasonable in this context.

At the same time, however, it is far from clear on this record that Defendant acted in bad faith.  Construing Plaintiff's motion in the light most favorable to the nonmovant, it is plausible that Dr. Alpert misheard Dr. Shah (or even that Dr. Shah misremembers their conversation).  As for the finger pain, although Dr. Alpert addressed that aspect of Plaintiff's claim only after being admonished, the fact that she ultimately did so renders the denial more reasonable than it otherwise would have been.  In short, genuine dispute remains at the crux of this case—did Defendant reasonably deny Plaintiff's claim?  On this record, that is a question "for the jury to decide." *Tomaselli*, 25 Cal. App. 4th at 1282.  Inasmuch as the parties seek summary judgment on the bad faith claim, both motions are denied.

C. Punitive Damages

Punitive damages in a tort action are authorized if the defendant shows, by clear and convincing evidence, that the defendant is guilty of malice, fraud, oppression or despicable conduct. *See* Calif. Civil Code §§ 3294(a), 3294(c)(1) and (2); *see also Tomaselli*, 25 Cal. App.

4th at 1287. Defendant argues that Plaintiff has not provided any evidence of this sort such that summary judgment on her punitive damages claim is appropriate. Plaintiff counters by arguing that she met this standard with evidence the Defendant had an annual incentive program that linked claim handler compensation to the company's bottom line.

Where an insurer's bad faith was "part of a conscious course of conduct, firmly grounded in established company policy," punitive damages may be warranted. *Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 987 (1978). Plaintiff, however, has failed to demonstrate as much. She points to Defendant's incentive program, but as other courts have recognized, that program is not inherently suspect. *See Till v. The Lincoln Nat'l Life Ins. Co.*, 182 F. Supp. 3d 1243, 1277 (M.D. Ala. 2016) (rejecting argument that bonuses motivated Lincoln personnel to deny legitimate claims), *Irgon v. Lincoln Nat'l Corp.*, No. 12-cv-4731-FLW, 2014 WL 12718984, at *8 (D.N.J. 2014) ("[T]he compensation of Lincoln's claims and appeal personnel is not tied to claims denials or terminations of benefits."). Evidence that this incentive program exists is neither clear nor convincing proof that Defendant is guilty of malice, fraud, oppression, or despicable conduct. The mere fact that Plaintiff's claim would be particularly costly for Defendant is insufficient to demonstrate the sort of malicious and despicable conduct that punitive damages are designed to address. Defendant's motion for summary judgment is therefore granted with respect to punitive damages.

## V. CONCLUSION

For the reasons explained above, Plaintiff's motion for summary judgment is denied, and Defendant's motion for summary judgment is denied except with respect to the breach of contract claim and the punitive damages sought; as to those two issues, Defendant's motion for summary judgment is granted. As a result, the breach of contract claim is dismissed, punitive damages are foreclosed, and the tortious breach of the covenant of good faith and fair dealing claim survives.

**IT IS SO ORDERED**.

Dated: January 9, 2025

_____
RICHARD SEEBORG
Chief United States District Judge